IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **NATASHA SLATER**, | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. 1:21-01181-JMC |
| **PAIK IMPLANT DENTAL ASSOCIATES, P.C. *et al*,** | * | |
| Defendants. | * | |

\* \* \* \* \* \* \*

**MEMORANDUM AND ORDER**

This is a dental malpractice case brought by Plaintiff Natasha Slater against Defendants Seung Paik, DDS, Phillip McIver, DDS, and Paik Implant Dentistry Associates, P.C. t/a/ ClearChoice Columbia ("ClearChoice"). Presently before the Court is Defendants' Motion for Summary Judgment and to Exclude Plaintiff's Medical Causation Testimony. (ECF No. 31). The Court has also reviewed Plaintiff's Opposition. (ECF No. 32). In summary, Defendants argue that Plaintiff's expert's deposition testimony contradicted some of the criticisms of care articulated in Count I of the Complaint and, in any event, he did not offer sufficiently reliable testimony to support Plaintiff's case. Moreover, Defendants argue that Plaintiff herself testified that she understood the proposed procedure and its risks and benefits as outlined, and that she signed the consent forms articulating same, negating Count II of the Complaint, Lack of Informed Consent.

On May 2, 2022, after reviewing the above filings, the Court entered an Interim Order asking for additional briefing from the parties concerning whether and to what extent Plaintiff was still pursing allegations of medical negligence as set forth in Count I of her Complaint in addition to allegations of Lack of Informed Consent as set forth in Count II of her Complaint. (ECF No.

33). The Court's Order was based on its preliminary observation that Plaintiff's expert's deposition testimony did not support all of the criticisms of care set forth in Count I.

On May 12, 2022, Plaintiff filed her response to the Court's Interim Order. (ECF No. 34). In her response, Plaintiff narrowed her allegations concerning medical negligence and reiterated her allegations concerning lack of informed consent. *Id*. With permission from the Court, Defendants filed a belated response on June 15, 2022. (ECF Nos. 36 and 39). In that response, Defendants for the first time raised arguments that both Counts I and II of the Complaint were barred by the applicable statute of limitations. In light of these newly-articulated arguments, the Court granted Plaintiff the ability to respond. (ECF No. 40).

For the reasons set forth more fully below, Defendants' Motion (ECF No. 31) is GRANTED in part and DENIED in part.

I. **BACKGROUND**

According to her Complaint, on February 22, 2016, Plaintiff presented to ClearChoice dental practice for potential treatment for her dentition. (ECF No. 1). It is not clear from the Complaint whether Plaintiff was merely seeking a cosmetic solution, although she clarified at her deposition that she wanted her teeth to be "nice and presentable." (ECF No. 31, Ex. 3 at 27-28). In any event, staff at ClearChoice talked to her about a proposed "all-on-four" treatment method for her upper teeth. (ECF No. 1 at 4). The treatment called for removal of all eight of Plaintiff's remaining natural upper teeth and a prosthesis fitted onto four metal implants that would be inserted in their stead. *Id.* Plaintiff alleges that staff took her through various consent forms about the procedure without the participation of an actual dentist, although she has since testified that Dr. Paik came in briefly during the visit. *Id*; ECF No. 31, Ex. 3 at 26. Based on the information provided, she consented to proceed with the all-on-four procedure.

2

On March 15, 2016, ClearChoice's Dr. McIver removed the eight healthy upper teeth and inserted five (instead of four) implants that would receive the prosthesis. (ECF No. 1 at 5). Plaintiff went back to have the prosthesis fitted in May of 2016, and then required multiple adjustments for issues that developed including loosening, breakage, retainage of food debris, and poor fit. *Id*. at 5-7.

Originally, Count I of the Complaint alleged professional negligence for several reasons, including: (1) offering such a radical procedure in the first place; (2) negligently fashioning the prosthesis, causing multiple refitting and re-setting visits; (4) negligent placement of the upper implants; and, (5) improperly placing and maintaining dental implants on two lower teeth. *Id*. at 8-9. These alleged breaches purportedly combined to cause: (1) the loss of eight healthy teeth; (2) the loss of adequate options to replace the teeth; (3) unnecessary procedures leading to unnecessary pain and suffering; and, (4) future care and treatment to include replacement of Defendants' work and maintaining a prosthesis for the rest of her life. *Id*. at 9. Count II of the Complaint alleged lack of informed consent based on a failure to disclose that the all-on-four procedure was extreme and would leave her with no backup options should the prosthesis fail given that all of her upper natural teeth had been removed. *Id.* at 10. Related, Plaintiff alleges that she was not adequately informed of the alternative benefits of keeping her eight healthy teeth. *Id*.

In support of her case, Plaintiff retained Dr. David Eggleston, D.D.S., a well-credentialled, board-certified prosthodontist. (ECF 32, Ex. 5). Dr. Eggleston's expert report essentially followed the breaches alleged in the Complaint. (ECF 32, Ex. 5 at 6-11). However, at his later deposition, Dr. Eggleston narrowed many of his standard of care criticisms, focusing more on informed consent issues.

In their initial motion, Defendants raise two related issues. (ECF No. 31). First, they contend that Dr. Eggleston's testimony does not support many of the breaches alleged in Count I. *Id.* Second, they assert that Dr. Eggleston has an inadequate basis for his opinions given, *inter alia*, his failure to examine Plaintiff or her prosthesis. *Id.* Finally, Defendants argue that Plaintiff's testimony that she understood the information conveyed to her and voluntarily consented to the procedure undermines any claim for lack of informed consent. *Id.*

After reviewing Defendants' initial motion and the transcript of Dr. Eggleston's deposition in detail, the Court questioned whether Plaintiff was still pursuing all of the breaches in care alleged in Count I, and asked the parties for additional briefing on that issue. (ECF No. 33). In her response, Plaintiff abandoned many of the criticisms outlined in Count I that centered on the creation and fitting of the appliance, the placement of the implants, and the aftercare. (ECF No. 34 at 1). Plaintiff's response brought her standard of care criticism into alignment with Dr. Eggleston's deposition testimony.

Defendants also seek to preclude Dr. Eggleston's informed consent opinions as in conflict with Plaintiff's testimony that she understood what was conveyed and consented nonetheless. Finally, Defendants recently added an argument that both counts are barred by limitations. (ECF No. 36, Ex. 2). The Court addresses these arguments below.

## II. STANDARD OF REVIEW

### a. Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party can do so by demonstrating the absence of any genuine dispute of material fact or by showing an absence of evidence to support the non-moving

party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). The court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)). However, the Court must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F. Supp. 2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). Consequently, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330–31 (4th Cir. 1998).

b. **Federal Rule of Evidence 702**

Under Federal Rule of Evidence 104(a), the court is responsible for determining "preliminary questions concerning the qualification of a person to be a witness" and "the admissibility of evidence," including the admissibility of expert testimony under Federal Rule of Evidence 702. *Young v. Swiney*, 23 F. Supp. 3d 596, 609 (D. Md. 2014); *see also Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011). Rule 702 permits a properly qualified expert witness to testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The party seeking admission of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence." *Fireman's Fund Ins. Co.*, 767 F. Supp. 2d at 553; *see also Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n. 10 (1993)).

Under the Supreme Court's decision in *Daubert*, the trial court serves as the gatekeeper, making a pretrial determination "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93. With respect to the reliability of an expert's reasoning or methodology, the Court in *Daubert* articulated several relevant factors: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. *Cooper*, 259 F.3d at 199 (citing *Daubert*, 509 U.S. at 593-94).

Ironically, though intended to lower the threshold for the admissibility of expert testimony, *Daubert* has become a talisman for those seeking exclusion of expert testimony of all types by attempting to "*Daubertize*" experts through rigid application of the Supreme Court's enunciated factors. However, the Supreme Court itself has cautioned that these factors are not a "definitive checklist," and their application should instead be "tied to the facts of a particular case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (citations and internal punctuation omitted).

Such guidance implicitly recognizes that some types of expert testimony are more suited to existing frameworks of scientific rigor than others. For example, determining whether a particular ignition source could generate the requisite heat to ignite a particular combustible is easily assessed based on known standards in physics, chemistry, and materials science. By contrast, whether a painting is a forgery may be more reliant on the experience of the expert and "softer" criteria, such as comparisons to other works or other methods recognized in the discipline. It is into this latter category that experts in medical malpractice cases typically fall, as the main basis for an expert's opinion as to breaches in care is often the expert's own training and experience in the field.

Accordingly, while "[e]vidence that has a greater potential to mislead than enlighten should be excluded," *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999), it need not be "irrefutable or certainly correct," *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006), to be admitted. To the contrary, Rule 702 favors admissibility if the testimony will assist the trier of fact. *See Westberry*, 178 F.3d at 261; *Mack v. Amerisourcebergen Drug Cor.*, 671 F. Supp. 2d 706, 709 (D. Md. 2009). Further, *Daubert* "is not a tool to challenge the persuasive value of an expert's conclusions . . . [or] intended to take the place of vigorous cross-examination or intrude on the province of the jury." *See Ruark v. BMW of North Am., LLC*, No. ELH-09-2738, 2014 U.S. Dist. LEXIS 11969 *19 (D. Md. Jan. 30, 2014). "In other words, the Supreme Court did not intend the gatekeeper role to 'supplant the adversary system or the role of the [factfinder]: [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id*. at *11 (quoting *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311-12 (11th Cir.1999)).

## III.    ANALYSIS

### a. Plaintiff's Narrowed Standard of Care Criticisms are Adequately Supported by Dr. Eggleston's Testimony

Originally, Plaintiff's standard of care criticisms included negligent fashioning and fitting of the prosthesis and negligent placement of upper and lower implants. The Court agrees with Defendants that Dr. Eggleston did not offer adequate support for those opinions, especially given he had never examined Plaintiff or her prosthesis. Perhaps as damaging, Dr. Eggleston did not actually offer such criticisms during his deposition, articulating no standard of care criticisms along those lines. To the contrary, a fair reading of Dr. Eggleston's deposition leads the Court to conclude that he no longer criticizes the fashioning and fit of the prosthesis, the placement of the implants, nor the post-operative adjustments and repairs that took place. (ECF No. 31, Ex. 4 at 45, 50). It appears that Plaintiff concedes as much. (ECF Nos. 32 and 34). However, to the extent it remains an open question, the Court grants Defendants' motion in part, and will preclude those opinions.

At the same time, the Court finds there is an adequate foundation for Dr. Eggleston's criticisms of offering the all-on-four procedure to Plaintiff in the first place, and then carrying out that treatment plan, condemning Plaintiff to a lifetime of follow-up and maintenance care from the inevitable cleaning and adjustments necessitated by having an implant. (ECF No. 31, Ex. 4 at 27-29). In effect, Dr. Eggleston's opinion is that Plaintiff was not a candidate for this procedure based on her age and the presence of eight healthy upper teeth. Dr. Eggleston has deep experience as a prosthodontist, and the basis for his opinions include his training and experience in this field, as well as the conclusion that the x-rays and images demonstrate that those eight teeth were healthy. Thus, Defendants' motion is denied with regard to such opinions.

### b. **Plaintiff's Informed Consent Criticisms are Adequately Supported by Dr. Eggleston's Testimony and the Adequacy of the Consent Process Remains a Jury Issue**

Plaintiff's informed consent theory is supported by Dr. Eggleston's deposition testimony. Thus, the Court will deny summary judgment and will not exclude these opinions. The crux of Dr. Eggleston's criticism is that the informed consent process was lacking because it was administered by a practice "educator," and not the treating dental providers such that Plaintiff was not given sufficient and specific understanding of the plan to which she was being asked to consent. (ECF No. 31, Ex. 4 at 27-29). Plaintiff was not offered or adequately educated about less extreme treatment options such as individual implants on select teeth (which was pursued on her bottom teeth) and the benefits of keeping her healthy top teeth. *Id*. at 34, 47. Dr. Eggleston questions whether Plaintiff understood the aftercare and maintenance that the proposed treatment plan would entail (and of which she now complains), as well as that eight otherwise healthy teeth would be removed (as documented in Plaintiff's dental records), such that she might have instead received individual implants for any unhealthy teeth rather than the bridge appliance chosen. Dr. Eggleston also questions whether Plaintiff was adequately informed of the lifetime of maintenance that would accompany the appliance.

Defendant argues that Dr. Eggleston did not speak with Plaintiff, and that Plaintiff testified that she recalls reviewing the consent forms and did not have any questions. It is true that Dr. Eggleston does not take any issue with the consent forms themselves. (ECF No. 31-4 at 26). However, informed consent is not just a form but a process. Dr. Eggleston has clearly described a procedural flaw in the process (i.e., not including a dental provider in the consent sign-off process) based on his training and experience of what an appropriate consent process should include. Further, Dr. Eggleston has also articulated a substantive flaw in the process in not specifically

9

explaining to Plaintiff that she would lose eight otherwise healthy teeth on which an alternative treatment plan could have been based, and would instead lose those healthy teeth in favor of a bridge appliance requiring significant follow-up care and maintenance.

As for Plaintiff's testimony and signing of the consent forms, they may indicate that Plaintiff adequately understood what was told to her *such as it was*, but, because the *content* of what was conveyed (and the process by which it was conveyed) was allegedly inadequate, a reasonable juror could conclude that Plaintiff's consent was not valid.

Finally, because Dr. Eggleston's testimony supports the allegation that Dr. Paik was not adequately involved in the consent process given the brief interaction he had with Plaintiff on February 22, 2016, and that Dr. McIver (who actually performed the extraction) himself had a separate duty to reasonably assure adequate consent, this criticism extends to both providers.

### c. The Fact-Intensive Nature of the Discovery Rule Precludes Summary Judgment on the Statute of Limitations Issue

For medical malpractice cases, Maryland utilizes a limited discovery rule for limitations purposes. Specifically, § 5-109 of Md Jud. Proc. Code Ann. provides that the statute of limitations expires the earlier of three years from the date actionable injury was discovered, or five years from the time the injury was committed. There is no dispute that Plaintiff filed her case beyond three years of the treatment and consent she criticizes, but within the five-year window. Thus, the issue for determination is whether Plaintiff had "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued." *Geisz v. Greater Baltimore Medical Center*, 313 Md. 301, 314, 545 A.2d 658, 664 (1988) (quoting *Poffenberger v. Risser*, 190 Md. 631, 637, 431 A.2d 647, 681 (1985)). Where it may be impossible for a lay person, unskilled in medicine or dentistry, "reasonably to understand

or appreciate that actionable harm has been done to him," a jury issue is presented. *Geisz*, 545 A.2d at 666 (citations omitted).

The very crux of the present case is whether the all-on-four option should have been offered and pursued by Plaintiff's dental professionals, and whether more information about the procedure was required to effect true informed consent. The very nature of the allegations suggest that Plaintiff was not given information that would have led a reasonable person in her position to question the appropriateness of the procedure or whether its alternatives and downsides were appropriately explained, preventing her from "discovering" her injury. While it may be that a reasonable jury will determine that her subsequent complications and visits should have prompted such inquiry, a reasonable jury could well conclude the opposite. Thus, this issue cannot be resolved by summary judgment, and Defendants' motion is denied to the extent it relies on the statute of limitations.

### IV.     CONCLUSION

For the foregoing reasons, Defendants' Motion (ECF No. 31) is **GRANTED in part** and **DENIED in part**. Specifically, the Motion is GRANTED to the extent Count I of Plaintiff's Complaint included criticisms of the fashioning and fit of the appliance itself or the placement of the upper and lower implants. It is DENIED in all other respects.

July 15, 2022                                                   /s/
Date                                                                      J. Mark Coulson
                                                                            United States Magistrate Judge